[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Plaintiff, Marcia Russell, daughter and administrator of the estate of Aldington Russell, seeks to recover on a group decreasing term accidental death insurance policy issued by defendant's predecessor company, on the life of Aldington Russell to cover the declining principal balance of a mortgage in the original amount of $100,000 executed by Marcia and Aldington.[1]
The case raises issues of coverage, that is, what constitutes accidental death under the policy, and of the meaning of an exclusion for alcohol consumption that have not previously been decided by Connecticut courts.
The facts are as follows: In January 1989, Marcia purchased a house in Windsor, Connecticut, mortgaged by Marcia and her father CT Page 13924 Aldington in favor of an affiliate of the defendant. In June 1990 Aldington was diagnosed with multiple myeloma. In December, 1990 plaintiff and Aldington applied for and were approved by defendant for group mortgage accidental death insurance.[2]
Plaintiff regularly paid the premium on the policy with her mortgage payment.
After the cancer diagnoses, Aldington began taking morphine to reduce pain. He was also a heavy drinker, regularly buying on Saturdays a one-half gallon of vodka that he consumed during the ensuing week. His daughter characterized him as an alcoholic. She and his wife also warned him against drinking and taking his medication.
In October 1992 Aldington went to Mount Sinai Hospital for a check-up after a course of chemotherapy. His condition was improved. The hospital report noted Aldington's pancytopenia was exacerbated by his alcohol abuse. The use of alcohol and chemotherapy were discussed with patient and his wife. The report states, "He was advised to refrain from any further drinking."
For several weeks prior to December 20, 1992, Aldington's cancer was in remission. Aldington was in good spirits and looking forward to the Christmas holidays. He started celebrating early on December 20, 1990 by purchasing his usual half gallon of vodka and starting to drink it with his brother-in-law all afternoon. Aldington complained of back pain and took morphine in liquid form twice. Aldington's son came to the house about 7:00 p.m. and Aldington talked and drank with him until 9:00 p.m.
At 10:00 p.m. Aldington told his wife, Olga, he was going to take his medication and a nightcap consisting of a tall, slim cup, three-fourth vodka and one-fourth milk, his usual mixture. Olga went to her separate room to sleep. Later that night she awoke, did not hear Aldington snoring, shook him, and discovered he was dead.
An autopsy performed by Dr. Malka Shah, associate medical examiner, found the cause of death to be acute ethanol and morphine toxicity. Blood samples revealed an alcohol concentration of .40%. and morphine presence of .56 mg/L. The original medical examiner's report indicated the manner of death as suicide. When the plaintiff requested Dr. Shah reassess the manner of death, Dr. Shah filed an amendment to her report, stating the following: (1) no suicide note was found at the CT Page 13925 scene; (2) the deceased had a history of alcoholism and becoming forgetful under the influence of alcohol; (3) the amount of morphine in the decedent's blood was at the upper limits of therapeutic range; (4) the amount of alcohol in decedent's blood was very high. She reiterated the cause of death as acute ethanol and morphine toxicity, and changed the manner of death to accident. The death certificate gave the same cause and manner of death.
Doctor Shah testified that the toxicity of alcohol and morphine that Aldington took on the day of his death combined to depress his respiration so that his lungs did not supply sufficient oxygen to his blood to sustain life.
Dr. Richard Pinder, Director of Toxicology Laboratory for the State Department of Public Health, testified the .40% alcohol level in Aldington's blood was very high, could have been lethal, and more likely than not, alcohol caused Aldington's death. However, he admitted he was not a medical examiner, not qualified to do autopsies, and conceded he agreed with Dr. Shah as to the cause of Aldington's death.
The court concludes from the evidence that while alcohol was not the sole cause of Aldington's death, it was a substantial contributing factor.
This court also concludes Aldington was not suicidal and that he did not intend, by his taking morphine and alcohol, to kill himself. Death was not anticipated, expected, or intended.
The defendant refused to pay on the policy, at first because its records showed the policy had lapsed. After that error was corrected, it denied coverage on the grounds death was not caused by accident, and the alcohol exclusion precluded liability. When it denied coverage, it sent plaintiff a check for $142.56 representing a return of premiums paid for the policy.
The balance of plaintiff's mortgage at time of Aldington's death was $98,245.87 and plaintiff had to expend another $4,037 to obtain a new mortgage to refinance the mortgage insured by defendant. Plaintiff has suffered emotional distress and incurred legal fees of $12,000.
Two issues are presented: (1) Was Aldington's death accidental within the meaning of the subject policy and (2) does CT Page 13926 the alcohol exclusion apply to bar plaintiff's recovery.
 I.
The policy provides as follows:
 The Company agrees to pay the amount of accidental death insurance in force upon receipt of due proof of insured's death, provided that the insured's death:
 (a) results directly (and independently of all other causes) from a bodily injury . . . of the debtor caused by an accident
while the debtor is insured under this policy. (underlining added).
"Accident" is not defined in the policy. To construe its meaning certain elementary rules apply. First, the plaintiff has the burden of proof on the issue of coverage, that is, whether or not her claim is covered by the policy. 44 Am.Jur.2d, Insurance §§ 1935, 36. Second, "[t]he rule is that language contained in a contract is to be given its ordinary meaning unless a technical or special meaning is clearly intended." Cogan v. Cogan,186 Conn. 592, 596 (1982). Specifically, as to insurance contracts, clear and unambiguous terms "are taken and understood in their plain, ordinary, and popular sense, unless such terms have acquired a different and technical sense in commercial usage . . ." 43 Am.Jur.2d Insurance, § 277. As stated inMalanga v. Royal Indemnity Company, 422 P.2d 704, p. 707 (Ariz. 1967), "Another principle often applied in these cases . . . is that undefined words of an accident insurance policy will be defined in the common sense terms of the average layman rather than in terms of a highly technical medical definition." The third rule is that "when a policy is so framed as to leave room for two construction, the words used in it should be interpreted most strongly against the insurer." O'Brien v. John HancockMutual Life Insurance Co., 143 Conn. 25, 27-9 (1955). The reason for the rule is "to effect the dominant purpose of indemnity or payment to the insured." 43 Am.Jur.2d Insurance § 283. See also Malanga v. Royal Indemnity Company, supra, p. 707.
Applying the rule that words in a policy are to be given their ordinary meaning, unless the policy indicates otherwise, "accident" is defined in The American Heritage Dictionary, Second CT Page 13927 College Edition, to mean: "1. An unexpected and undesirable event. 2. Something that occurs unexpectedly or unintentionally. . . . 4. Fortune or chance."
This definition is consistent with the meaning given to the word by our Connecticut courts. In King v. Travelers InsuranceCompany, 123 Conn. 1, 6 (1937) the court quotes Linmore v. AetnaBrewing Co., 91 Conn. 158, 162 (1916) to the effect, "`an accident may be defined as an unlooked-for mishap or an untoward event or condition not expected.'" As stated in Hammer v.Lumberman Casualty Co., 214 Conn. 573, 594 (1990), "an accident is an unintended occurrence."
The precise issue here presented is whether the death of a person as a result of voluntarily consuming alcohol and morphine can be held to be accidental within the meaning of the subject policy and so compensable under the policy. No Connecticut courts have addressed this issue.
A line of cases in other jurisdiction hold such deaths are not accidental when the policy covers death by "accidental means." In Weil v. Federal Kemper Life Assurance Co.,866 P.2d 774 (Cal. 1994) the insured died from an unintentional overdose of cocaine. The California Supreme, reversing the California Court of Appeals, noted that coverage under "accidental means" policies and "accidental death" policies differ. The distinction is between the result to the insured and the means causing the result. When the means are what the insured intended to use and did use, they are not accidental and death is not compensable under an accidental means policy. Thus the court held in Weil that the insured's death, arising from a voluntary and intentional act that results in an unintentional overdose of cocaine, was not caused by "accidental means" within the meaning of the insurance policy. See also Lloyd v. First Farwest LifeInsurance Co., 773 P.2d 426, 427 (Wash.App. 1989); Jackson v.National Life Accident Insurance Co., 202 S.E.2d 711, 712
(Ga.App. 1973); Gordon v. Metropolitan Life Insurance Co.,260 A.2d 338 (Md. 1970).
However, these cases are not apposite for two reasons. First, and most important, the subject policy to be construed by this court does not provide coverage of death by accidental means, but rather death "caused by an accident." Secondly, the distinction between accidental means and result has been largely discredited as plunging this area of the law into a "Serbovian Bog." Harrell
CT Page 13928v. Minnesota Mutual Life Insurance Co., 937 S.W.2d 809, 812
(Tenn. 1996) quoting Justice Cardozo dissenting in Landress v.Phoenix Mutual Life Ins. Co., 291 U.S. 491, 499 (1934). See alsoWeil v. Federal Kemper Life Assurance Co., supra, dissent of Justice Musk, 866 P.2d 774, at 789 et seq.; Marsh v. MetropolitanLife Ins., 388 N.E.2d 1121, 1124 (Ill.App. 1979); Vallejos v.Colonial Life Accident Insurance, 571 P.2d 404, 406 (N.M. 1977). Beckham v. The Travelers Insurance Co., 225 A.2d 532,535 (Pa. 1967).
Focusing on accidental death policies of the type here in suit, in situations where death is caused by a consumption of a lethal combination of drugs or an overdose of one drug, all courts hold there is no coverage when death is intentional. However, courts reach different results on the issue of coverage depending on the knowledge of the insured as to the consequence of taking the drug. The cases reflect four variables: (1) whether the insured's knowledge is attributed to him as a reasonable man or (2) actually held by him, and on whether his knowledge is (3) of the drugs being harmful or (4) likely to cause death.
Some courts apply the standard of what the insured knew or should have known about the consequences of taking the drug. As stated in California State Life Insurance Co. v. Fugua,10 P.2d 958, 960 (Ariz. 1932), ". . . an effect which was or should have been reasonably anticipated by an insured to be the natural or probable result of his own voluntary act is not accidental . . . . The test is what effect should the insured as a reasonable man expect from his own actions under the circumstances."
Applying this test in Malanga v. Royal Indemnity Company,422 P.2d 704, (Ariz. 1967) to a situation in which the insured died as a result of the combined effect of alcohol and barbiturates, similar to the cause of Aldington's death in the instant case, the Arizona Supreme Court found coverage under an accidental death policy based on the fact the insured did not know or "have any reason to know" that that combination of drugs would produce an injury resulting in death. Id. at 708.
Other courts reject the test of foreseeability of harm by a reasonable man to determine whether an overdose of a drug is an accident within the meaning of a policy. Marsh v. MetropolitanLife Insurance Co., 388 N.E.2d 1121, 1123 (Ill.App. 1979). InCollins v. Nationwide Life Insurance Company, 294 N.W.2d 194, CT Page 13929 196 (Mich. 1980) the insured died as a result of acute alcohol intoxication. In finding the death accidental under the double indemnity provisions of an accidental death policy, the Michigan Supreme Court stated, "The question is not whether the death was reasonably foreseeable, but whether the death was in factforeseen by the insured". (Emphasis added). See also Pfeiferv. World Service Life Insurance Co., 360 N.W.2d 65, 66 (Wisc. 1984) rejecting the standard of "what a reasonable person in his [the insured's] position would believe."
Some cases hold that a death by drugs is not accidental if insured knew of their "injurious consequences." Lloyd v. FirstFarwest Life Insurance Company, 773 P.2d 426, 428 (Wash.App. 1989); Weil v. Federal Kemper Life Assurance Co., supra,866 P.2d at p. 786.
But other cases hold that for a death by drugs not to be accidental, the insured must know that their consumption would in all probability cause his death. Thus, as stated in Collins v.Nationwide Life Insurance Co., supra, 294 N.W.2d at p. 194. "In order to defeat recovery under a double indemnity provision, as involved herein, the insured must have intended or expected that his conduct would in all Probability result in his death." (Emphasis added). In Pfeifer v. World Service Life InsuranceCo., 360 N.W.2d 65, 66 (Wisc. 1984), the court held, "we are satisfied that the trial court applied the proper test under Wyoming law: whether Thomas knew or expected that his actions might result in his own death, . . . ." In Vallejos v. ColonialLife Accident Insurance Co., 571 P.2d 404, 406 (N.M. 1977), the Supreme Court of New Mexico, reversing a lower court, held, "When a person dies from the injection or consumption of narcotics without the intention to injure himself or commit suicide, his death is to be considered an accident. . . ." See also ProvidentLife Accident Insurance Co. v. Hanna, 311 So.2d 294, 297
(1975).
In Metropolitan Life Insurance Co. v. Main, 383 F.2d 452, 960
(5th Cir. 1967) where insured died as a result of the synergistic effect of taking barbiturate tablets and whiskey, the court, applying Connecticut law, held the death to be accidental within the meaning of an accidental death policy where there was no showing that the insured intended to take sufficient alcohol and tablets to cause his death and where there was no evidence he intended to commit suicide. CT Page 13930
From these latter cases, this court discerns that in death by drugs cases, to determine coverage under an accidental death policy, the proper standard of insured's knowledge of the consequence of drugs is: (1) the insured's actual knowledge, not that attributed to him as a reasonable man and (2) the knowledged must be that taking of the drugs would likely kill him, not be harmful or dangerous.
Thus this court concludes that when an insured dies as a result of voluntary consumption of one or a combination of drugs, the death is accidental within the meaning of an accidental death policy of the type here in suit, if the insured did not, in fact, know or been actually warned such drugs were likely to cause his death.
But if he had actual knowledge, not that attributed to him as a reasonable man, and if the knowledge was that the consumption of the drug would in all probability kill him, not that it was simply harmful, then the reasonable inference can be made that by his taking the drug he intended to take his life. Under such circumstances his death must be deemed not accidental and, thus, not covered by the policy.
This conclusion rests on the foundation that "accident" commonly means to a layman an unexpected, unintended event. It has solid roots in Connecticut where our courts define accident as "an unintended occurrence". Hammer v. Lumberman Casualty Co.,214 Conn. 573, 594 (1990), or "an unlooked for mishap or an untoward event or condition not expected." King v. TravelersInsurance Co., 123 Conn. 1, 6 (1937).
The facts, as found by this court, are that Aldington was warned by his family against drinking alcohol and taking his medication and also advised by the hospital against drinking. There was no evidence that he knew or had been advised that the combination of alcohol and morphine was likely to cause his death. On December 20, 1992 Aldington was in a good mood and was looking forward to the Christmas holiday. There was no evidence he was depressed or suicidal. The court finds that on that day he did not intend, by consuming alcohol and morphine, to take his own life.
The court, therefore, concludes his death, resulting from the synergistic effect of alcohol and morphine, was accidental and was covered by the accidental death policy issued by the CT Page 13931 defendant.
 II.
The alcohol exclusion clause of the policy provides:
 The Company's liability is limited if you die from taking alcohol or any illegal drugs. The Company's liability is limited to return of the premium be paid for the coverage.[3]
(Emphasis added).
The defendant alleged this alcohol exclusion in its answer as a special defense. Both on the ground defendant has the obligation to prove a special defense (State v. Arroyo,181 Conn. 426, 430 (1980)), and the general rule that "[t]he burden of proving an exception to a risk is on the insurer". O'Brien v.John Hancock Mutual Life Insurance Co., 143 Conn. 25, 29 (1955); 10 Couch, Cyclopedia of Insurance Law (2d Ed. Rev. 1982) § 41:49, p. 84, the defendant has the burden of proof on this issue.
Language in an accidental death policy excluding or limiting liability "in case injury of the insured occurs while the latter is under the influence of any intoxicant or narcotics, and other provisions of similar language, are generally held to be reasonable and valid." Couch, supra, § 41-456, p. 510.
Plaintiff relies on the well-established rule that an insurance company, seeking to limit its coverage under a policy by special provisions or exceptions, must state those limitations in clear terms so as not to mislead the insured. Boon v. AetnaInsurance Co., 40 Conn. 575, 586 (1874). If an insurer uses ambiguous language, "any uncertainty caused by that ambiguity will be resolved against the insurer." Hansen v. Ohio CasualtyInsurance Co., 239 Conn. 537, 548 (1996).
Plaintiff contends the policy words death "from taking alcohol" are ambiguous because it is uncertain whether that language means that alcohol must be the sole cause of death or a factor leading to Aldington's death. Applying the principle stated in O'Brien v. John Hancock Mutual Life Insurance Co.,143 Conn. 25, 28-9 (1955) that when policy words "leave room for two constructions, the words used . . . should be interpreted most strongly against the insurer," plaintiff argues that the alcohol CT Page 13932 exclusion in the subject policy should be construed to mean death caused solely by alcohol. Since the evidence is that Aldington's death was not the result of his consumption of alcohol alone, plaintiff contends the exclusion should not apply to bar her recovery.
This court disagrees. First, as indicated above, insurance, policy language is to be interpreted consistent with the common sense understanding of the average layman. Second, the exclusion clause here to be construed is not ambiguous. If the defendant meant death exclusively caused by alcohol, it would have used the language it used as to coverage: death "directly (and independentof all other causes) caused by an accident." (Emphasis added). The clause in question is simple, clear, and requires neither strict nor liberal construction. Couch, supra § 41-458, p. 512. The ordinary insurer would understand it to mean death resulting from the use of alcohol. As long as there is some "causative connection" between alcohol and death, the exclusion applies. As stated in Couch, supra § 41-466, p. 519:
 Where the exception clause is so phrased that the harm is the consequence or sequel of insured's intoxication or other specified condition, it necessarily follows that in order to avoid liability under the exception, the insurer must establish some causative connection with the death or injury of the insured. . . ."
The facts in this case are that Aldington had been drinking all afternoon and evening of December 20, 1992; he took morphine and a three-quarter glass full of vodka as a nightcap; his autopsy revealed an alcohol count reading of .40%. While alcohol may not have been the sole cause of death, it was a substantial factor in causing Aldington's death. Without the alcohol, he would not have died.
From this factual finding, this court concludes Aldington died "from taking alcohol" within the meaning of the policy.
Defendant has met its burden of proving that the alcohol exclusion of the policy applies, and that provision bars plaintiff's recovery.
It follows from defendant prevailing on the first count of the plaintiff's complaint that it also prevails on the second and CT Page 13933 third counts alleging breaches of the implied covenant of good faith and fair dealing.
Accordingly, judgment may enter in favor of the defendant on all counts of plaintiff's complaint.
Robert Satter Judge Trial Referee